**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO.:** |
| | ) | |
| **v.** | ) | |
| | ) | **VIOLATIONS:** |
| | ) | |
| | ) | **18 U.S.C. § 1343** |
| | ) | **(Wire Fraud);** |
| **SEAN T. JOHNSON,** | ) | |
| | ) | **18 U.S.C. § 1956(a)(1)(A)(i)** |
| | ) | **(Laundering Of Monetary Instruments);** |
| **Also known as** | ) | |
| **Shawn Johnson,** | ) | **18 U.S.C. § 1028A(a)(1)** |
| | ) | **(Aggravated Identity Theft)** |
| **Defendant.** | ) | |
| | ) | |
| | ) | **FORFEITURE ALLEGATION:** |
| | ) | |
| | ) | **18 U.S.C. § 981(a)(1)(C); 18 U.S.C.** |
| | ) | **§ 982(a)(1); 21 U.S.C. § 853(p); and** |
| | ) | **28 U.S.C. § 2461(c)** |
| | ) | |
| _____ | ) | |

**INDICTMENT**

The Grand Jury charges that:

**BACKGROUND**

At all times material to this Indictment:

1.      Defendant, SEAN T. JOHNSON, also known as SHAWN JOHNSON
("JOHNSON") is a United States citizen who claimed to be a resident of Georgia, New York,
Virginia, Nevada, Florida, and California, and purported to be a multi-millionaire investor.

2.      Person A was a resident of Washington, D.C., and a former colleague of JOHNSON
when they worked together in Bethesda, Maryland.

3.      Person B was a resident of both Maryland and Texas who met JOHNSON through a mutual friend.

4.      Person C was a resident of Maryland who met JOHNSON at a nightclub in Washington, D.C.

5.      Person D was a resident of both Ohio and Florida and a retired real estate investor who met JOHNSON after JOHNSON struck up a friendship with Person D's wife.

6.      Person E was a resident of Virginia and small business owner who provided JOHNSON with transportation services.

7.      Person F was a resident of Washington, D.C. who met JOHNSON through JOHNSON's then-girlfriend.

8.      Person G was a resident of the United Kingdom who met JOHNSON in Los Angeles, California.

9.      Person H was a resident of Maryland who was introduced to JOHNSON at a nightclub in Washington, D.C.

10.     Person I was a resident of Texas who met JOHNSON in Las Vegas, Nevada.

11.     Person J was a resident of Illinois and a small-business owner who met JOHNSON in Las Vegas, Nevada.

## COUNTS ONE THROUGH FOURTEEN
### (Wire Fraud)

### The Scheme to Defraud

12.     The allegations contained in paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth herein.

13.     From in or about September 2012, and continuing thereafter through in or about September 2018, within the District of Columbia and elsewhere, the defendant SEAN T.

JOHNSON, devised and intended to devise a scheme to defraud and for obtaining money and property from Persons B, C, D, E, F, H, I, and J by means of materially false and fraudulent pretenses, representations, and promises.

### Purpose of the Scheme

14.     It was the purpose of the scheme to defraud for JOHNSON, by means of false and fraudulent pretenses, to obtain money and property from his victims by having them invest in business ventures that were not real and then convert the invested monies to his own use.

### The Manner and Means of the Scheme to Defraud

15.     It was part of the scheme to defraud that beginning at least as early as in or about September 2012 and continuing through at least September 2018, JOHNSON fraudulently obtained funds totaling at least $1 million from victims by falsely holding himself out to be a wealthy investor worth millions of dollars.

16.     It was further a part of the scheme to defraud that JOHNSON offered his victims an opportunity to invest in various ventures with the promise of returns on their investments, even though JOHNSON intended to keep the monies provided by the victims for his own personal use.

17.     It was further a part of the scheme to defraud that JOHNSON induced his victims to give him money by falsely representing to them that he was wealthy and that he was friends with celebrities.

18.     It was further a part of the scheme to defraud that within the District of Columbia and elsewhere, JOHNSON used monies provided to him by victims to purchase vehicles, clothing and other merchandise manufactured by high-end luxury designers, alcohol at clubs, bars, and restaurants, airline flights both domestically and internationally, tickets to professional sporting

events, and hotel rooms, all in an effort to further promote the false image that he was a multi-millionaire investor.

19.     It was further a part of the scheme to defraud that within the District of Columbia and elsewhere, JOHNSON used monies victims deposited into bank accounts he controlled, directly and indirectly, to withdraw cash and to make payments on credit cards, in an effort to conceal and disguise the nature, location, source, ownership, and control of the monies.

20.     It was further a part of the scheme to defraud that JOHNSON falsely represented to his victims that he had an assistant who was helping him to manage their investments. JOHNSON created this non-existent assistant using the identity of Person A, who was one of JOHNSON's former colleagues, signing emails in the name of Person A that were in fact written by JOHNSON himself for the purpose of furthering his fraud scheme.

**Person B**

21.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person B who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $200,000.00.

22.     On or about September 2012, Person B was introduced to JOHNSON through a mutual friend.

23.     JOHNSON told Person B that he was a businessman and investor.

24.     On or about September 2012, JOHNSON offered Person B an opportunity to invest with him and explained that the investment would be in alcohol sales related to homecoming events at Howard University.

25.     In or about October 2012, JOHNSON provided Person B with a document labeled "Promissory Note" that was dated September 28, 2012.   The Promissory Note included language that stated that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person B was to provide $50,000 to JOHNSON in exchange for a return of $60,000, on or before January 27, 2013.   The Promissory Note also provided that Person B's principal investment was "not at risk of being forfeited or decreased."   The Promissory Note was signed by JOHNSON on or about September 28, 2012.

26.     The September 28, 2012 Promissory Note was emailed to Person B from the email address janeymos@gmail.com.   The email attaching the Promissory Note was signed in the name of Person A, who identified herself as JOHNSON's executive assistant.

27.     In or about October 2012, JOHNSON offered Person B an opportunity to invest with him in another venture.   JOHNSON explained that this investment would be in parties and events associated with the 2013 inauguration of President Barack Obama.

28.     In or about November 2012, JOHNSON provided Person B with a document labeled "Promissory Note" that was incorrectly dated October 22, 2010.   The Promissory Note included language that stated that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person B was to provide $200,000 to JOHNSON in exchange for a minimum return of $260,000, on or before March 21, 2013.   The Promissory Note also provided that Person B's principal investment was "not at risk of being forfeited or decreased."   The Promissory Note was signed by JOHNSON on or about October 22, 2012.

29.     The October 22, 2012 Promissory Note was emailed to Person B from the email address janeymos@gmail.com.   The email attaching the Promissory Note was signed in the name of Person A, who identified herself as JOHNSON's executive assistant.

30.     Between on or about October 9, 2012 and on or about November 15, 2012, Person B provided JOHNSON with a total of $200,000 through two wire transfers to JOHNSON's bank account and one check.

31.     JOHNSON used the money provided by Person B not for alcohol sales for events surrounding the Howard University Homecoming nor parties and events associated with the 2013 inauguration of President Barack Obama, but rather to pay for JOHNSON's personal expenses.

32.     To date, JOHNSON has not repaid Person B.

**Person C**

33.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person C who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $29,500.

34.     On or about early 2013, Person C was introduced to JOHNSON through a mutual friend.   JOHNSON informed Person C that he invested in and owned Marriott hotels, invested in boxing matches, and was involved in the stock market.

35.     JOHNSON solicited money from Person C on the pretense that Person C would be investing in a Marriott Hotel and Las Vegas arena deal with, among others, the professional boxer Floyd Mayweather and the retired professional basketball player and investor Magic Johnson.

36.     Based on JOHNSON's representations, Person C gave JOHNSON a total of approximately $11,000 for the Marriott Hotel deal.   Then, between November 2013 and April 2014, Person C gave JOHNSON an additional $18,500, for the Las Vegas, Nevada arena deal.

37.      On or about March 2014, JOHNSON provided Person C with a document labeled "Promissory Note" that was dated March 2, 2014.   The Promissory Note included language that

stated that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person C was to provide $25,000 to JOHNSON in exchange for a return of 10%, within 180 days (September 1, 2014).   The Promissory Note also provided that Person C's principal investment was "not at risk of being forfeited or decreased."   The Promissory Note was signed by JOHNSON on or about March 2, 2014.

38.     The Promissory Note was emailed to Person C from the email address janeymos@gmail.com.   The email attaching the Promissory Note was signed in the name of Person A, who identified herself as JOHNSON's assistant and who was described by JOHNSON as his assistant.

39.     JOHNSON used the money provided to him by Person C, not to invest in a Marriott Hotel or a Las Vegas arena deal, but on JOHNSON's own personal expenses.

40.     To date, JOHNSON has not repaid Person C.

**Person D**

41.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person D who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $605,000.

42.     On or about June 2013, JOHNSON met Person D and his wife in Miami, Florida. JOHNSON falsely represented to Person D that he was an entertainment lawyer as well as a concert promoter.

43.     On or about June 2013, JOHNSON falsely represented to Person D that he had an investment opportunity that would allow Person D to invest in the world tour of singer Rihanna. JOHNSON told Person D that he was promoting and financing the tour and that, as part of the

investment, Person D would receive back his initial investment plus a percentage of the concert sales.

44.       On or about July 2013, JOHNSON provided Person D with a document labeled "Promissory Note" that was dated July 21, 2013.   The Promissory Note included language that stated that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person D was to provide $200,000 to JOHNSON in exchange for a return of a minimum of $240,000, on or before October 20, 2013.   The Promissory Note also provided that Person D's principal investment was "not at risk of being forfeited or decreased."

45.       On or about July 21, 2013, Person D and JOHNSON signed the Promissory Note.

46.       On or about July 22, 2013, Person D provided JOHNSON with $100,000 via a check that was deposited into JOHNSON's TD Bank account x2093.

47.       Between on or about July 22, 2013 and on or about November 11, 2013, JOHNSON communicated with Person D a number of times over the phone.   On these phone calls, JOHNSON would provide Person D with updates about the progress of the Rihanna World Tour.

48.       Between on or about September 10, 2013, and on or about October 28, 2013, JOHNSON called Person D and represented that he was in Shanghai, China with the Rihanna World Tour and told Person D that the tour needed more money.

49.       Based on JOHNSON's representations, between August 8, 2013 and November 13, 2013, Person D provided JOHNSON with an additional $505,000.00 for the purported investment in the Rihanna World Tour.

50.       JOHNSON used the money provided to him by Person D, not to invest in the Rihanna World Tour, but rather on JOHNSON's own personal expenses.

51.       To date, JOHNSON has not repaid Person D.

**Person E**

52.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person E who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $85,000.00.

53.     In or about September 2013, JOHNSON was referred to Person E for the purpose of utilizing Person E's limousine business.   Thereafter, JOHNSON hired Person E to drive him around Washington, D.C., Maryland, and Virginia when he was in town.

54.     In or about March 2014, JOHNSON offered Person E an opportunity to invest with him and explained that the investment would be in rap concerts.

55.     On or about March 28, 2014, JOHNSON provided Person E with a document labeled "Promissory Note" that was dated March 28, 2014.   The Promissory Note included language that stated that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person E was to provide $150,000 to JOHNSON in exchange for a return of 25%, on or before August 1, 2014.   The Promissory Note also provided that Person E's principal investment was "not at risk of being forfeited or decreased."   The Promissory Note was signed by JOHNSON on or about March 28, 2014.

56.     The Promissory Note was emailed to Person E from the email address janeymos@gmail.com.   The email attaching the Promissory Note was signed in the name of Person A, who identified herself as JOHNSON's executive assistant.

57.     Between on or about March 28, 2014, and on or about August 2014, Person E provided JOHNSON with approximately $85,000 as part of his investment in rap concerts.

58.     JOHNSON used the money provided by Person E, not to invest in rap concerts, but rather to pay for JOHNSON's personal expenses.

59.     To date, JOHNSON has not repaid Person E.

**Person F**

60.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person F who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $27,300.00.

61.     On or about 2014, Person F was introduced to JOHNSON at a nightclub in Washington, D.C.   JOHNSON told Person F that he invested in clubs in Atlanta, Georgia, Miami, Florida, and Las Vegas, Nevada.

62.     JOHNSON offered Person F an opportunity to invest with him and explained that the investment would be in a club JOHNSON was opening in Miami, Florida.

63.     On or about August 26, 2014, JOHNSON provided Person F with two documents both labeled "Promissory Note." Both of the Promissory Notes were dated August 26, 2014.

64.     The Promissory Notes were emailed to Person F from the email address janeymos@gmail.com.   The email attaching each Promissory Note was signed in the name of Person A, who identified herself as JOHNSON's executive assistant.

65.     The first Promissory Note included language that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person F was to provide $20,000 to JOHNSON in exchange for a return of a minimum of $22,000, on or before February 25, 2015. The second Promissory Note included language that it was "a financial entertainment investment agreement."   Under the terms of the agreement, Person F was to provide $5,000 to JOHNSON in

exchange for a return of a minimum of $6,000, on or before November 26, 2015.   Both of the Promissory Notes guaranteed that Person F's principal investment was "not at risk of being forfeited or decreased."

66.     Between on or about August 19, 2014 and on or about August 28, 2014, Person F provided JOHNSON with approximately $27,300.00, as part of the purported investment in a club in Miami, Florida.

67.     In or about February 2015, Person F contacted JOHNSON about the status of the return of his investment.   Over the course of the next several months, JOHNSON provided excuses for why he was unable to return Person F's investment at that particular time.

68.     JOHNSON used the money provided by Person F, not to invest in a club in Miami, Florida, but rather to pay for JOHNSON's personal expenses.

69.     To date, JOHNSON has not repaid Person F.

**Person G**

70.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person G who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $106,000.

71.     On or about June 2014, Person G met JOHNSON through an acquaintance while in Los Angeles, California.

72.     JOHNSON falsely represented to Person G that he was a private equity investor, venture capitalist, and a business consultant for professional boxer Floyd Mayweather.

73.     In or about March 2015, JOHNSON offered Person G and two of her relatives an opportunity to invest with him and explained that the investment would be in the ticket sales, cable

sales, and other general revenue associated with the boxing match between Floyd Mayweather and Manny Pacquiao. JOHNSON also told Person G and her two relatives that money from her investment would also go into a new stadium being built in Las Vegas, Nevada.

74.     Between March 2015 and April 2015, Person G and her two relatives gave JOHNSON, collectively, approximately $106,000 as part of their investment in the Mayweather-Pacquiao fight and Las Vegas stadium.

75.     JOHNSON used the money provided by Person G and her relatives, not to invest in the Mayweather-Pacquaio fight or a Las Vegas stadium, but rather to pay for JOHNSON's personal expenses.

76.     To date, JOHNSON has not repaid Person G and her relatives.

**Person H**

77.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person H who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $11,190.

78.     In or about July 2014, Person H met JOHNSON while at a nightclub in Washington, D.C.

79.     In or about March 2015, JOHNSON offered Person H an opportunity to invest with him and explained that the investment would be in the ticket sales, cable sales, and other general revenue associated with the boxing match between Floyd Mayweather and Manny Pacquiao.

80.     In or about March 2015, Person H gave JOHNSON a total of approximately $11,190 as part of her investment in the Mayweather-Pacquiao fight.

12

81.     JOHNSON used the money provided by Person H, not to invest in the Mayweather-Pacquiao fight, but rather to pay for JOHNSON's personal expenses.

82.     To date, JOHNSON has not repaid Person H.

**Person I**

83.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person I who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $20,000.00.

84.     In or about February 2017, Person I was at the Aria Hotel in Las Vegas, Nevada when JOHNSON introduced himself at a roulette table.

85.     JOHNSON told Person I that he was a wealthy businessman, worked in the financial sector, and hosted special event parties.

86.     In or about March 2017, JOHNSON offered Person I an opportunity to invest with him and explained that the investment would be in events surrounding the NCAA Basketball Tournament.

87.     Between on or about March 1, 2017 and on or about March 9, 2017, Person I sent two electronic wire transfers totaling $20,000.00, into JOHNSON'S bank account as part of her investment in events surrounding the NCAA Basketball Tournament.

88.     JOHNSON used the money provided by Person I, not to invest in events surrounding the NCAA Basketball Tournament, but rather to pay for JOHNSON's personal expenses.

89.     To date, JOHNSON has not repaid Person I.

**Person J**

90.     In furtherance of the scheme to defraud, JOHNSON made materially false and fraudulent pretenses, representations and promises to Person J who, based on those materially false and fraudulent pretenses, representations and promises provided JOHNSON with approximately $5,000.00.

91.     On or about March 26, 2017, Person J was staying at the Aria Hotel in Las Vegas, Nevada when JOHNSON introduced himself at a craps table.

92.     In or about May 2017, Person J contacted the FBI about JOHNSON, and agreed to cooperate in the criminal investigation of JOHNSON.   Subsequently, JOHNSON contacted Person J and offered Person J the opportunity to invest in a business opportunity that involved providing private financing to celebrities.   Person J declined this invitation.

93.     On or about July 22, 2017, JOHNSON represented to Person J that he was providing him with an opportunity to invest in the profits related to Mayweather Promotions for the Mayweather-McGregor boxing match scheduled for August 26, 2017.   As part of his cooperation with the criminal investigation of JOHNSON, Person J agreed to make the investment, and deposited $5,000 in a bank account identified by JOHNSON.

94.     JOHNSON used the money provided by Person J, not to invest in profits related to Mayweather Promotions for the Mayweather-McGregor boxing match, but rather to pay for JOHNSON's personal expenses.

**The Execution of the Scheme**

95.     On or about each of the dates specified below, in the District of Columbia and elsewhere, defendant JOHNSON, for the purpose of executing the scheme described above, did transmit and cause to be transmitted by means of wire communication in interstate commerce the

writings, signs, signals, pictures, and sounds described below for each count, each transmission constituting a separate count:

| COUNT | ON OR ABOUT DATE | Origination | DESCRIPTION |
|---|---|---|---|
| **ONE** | October 2, 2013 8:08 a.m. | Washington, D.C. | Interstate cellular phone call between JOHNSON and Person D. |
| **TWO** | October 5, 2013 9:34 a.m. | Washington, D.C. | Interstate cellular phone call between JOHNSON and Person D. |
| **THREE** | October 5, 2013 9:53 a.m. | Washington, D.C. | Interstate cellular phone call between JOHNSON and Person D. |

| COUNT | ON OR ABOUT DATE | AMOUNT | LOCATION | DESCRIPTION |
|---|---|---|---|---|
| **FOUR** | January 15, 2014 | $5,000.00 | Washington, D.C. | Cash deposit by Person C into JOHNSON's TD Bank Account x2093 |
| **FIVE** | February 28, 2014 | $500.00 | Washington, D.C. | Cash deposit by Person C into JOHNSON's TD Bank Account x2093 |
| **SIX** | August 19, 2014 | $4,800.00 | Washington, D.C. | Deposit by Person F into JOHNSON's TD Bank account x2093 |
| **SEVEN** | August 26, 2014 | $6,000.00 | Washington, D.C. | Deposit by Person F into Wells Fargo account x0753, per JOHNSON's instructions |
| **EIGHT** | August 26, 2014 | $2,650.00 | Washington, D.C. | Deposit by Person F into Wells Fargo account x6246, per JOHNSON's instructions |
| **NINE** | August 27, 2014 | $5,750.00 | Washington, D.C. | Deposit by Person F into Wells Fargo account x2733, per JOHNSON's instructions |
| **TEN** | August 27, 2014 | $1,550.00 | Washington, D.C. | Deposit by Person F into JOHNSON's TD Bank account x2093 |
| **ELEVEN** | August 28, 2014 | $250.00 | Washington, D.C. | Deposit by Person F into Wells Fargo account x8684, per JOHNSON's instructions |
| **TWELVE** | August 28, 2014 | $3,700.00 | Washington, D.C. | Deposit by Person F into JOHNSON's TD Bank account x2093 |
| **THIRTEEN** | August 28, 2014 | $1,000.00 | Washington, D.C. | Deposit by Person F into Wells Fargo account x0753, per JOHNSON's instructions |

| **FOURTEEN** | July 25, 2017 | $5,000.00 | Washington, D.C. | Cash Deposit by Person J into JOHNSON's Wells Fargo Bank account x5430 |
|---|---|---|---|---|

**(Wire Fraud, in violation of Title 18, United States Code, Section 1343)**

## COUNT FIFTEEN
### (LAUNDERING OF MONETARY INSTRUMENTS)

96.     The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 95, as if fully set forth herein.

97.     On or about August 20, 2014, SEAN T. JOHNSON, in the District of Columbia and elsewhere, conducted and attempted to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, with the intent to promote the carrying on of such specified unlawful activity and, that while conducting and attempting to conduct such financial transaction, knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

**(Money Laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i))**

## COUNT SIXTEEN
### (AGGRAVATED IDENTITY THEFT)

98.     The Grand Jury re-alleges and incorporates by reference the allegations of paragraphs 1 through 95, as if fully set forth herein.

99.     Beginning on or about September 2, 2009, and continuing until the present day, in the District of Columbia and elsewhere, the defendant, SEAN T. JOHNSON, did knowingly possess and use, without lawful authority, a means of identification of another person, Janey Moskowitz, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to

wit Wire Fraud in violation of Title 18, United States Code, Section 1343, knowing that the means of identification belonged to another actual person.

**(Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A(a)(1))**

## FORFEITURE ALLEGATION

102.    Upon conviction of any of the offenses alleged in Counts One through Count Fourteen, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

103.    Upon conviction of the offense alleged in Count Fifteen, the defendant shall forfeit to the United States any property, real or personal, involved in these offenses, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, involved in these offenses, and any property traceable to such property.

104.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property that cannot be divided without

difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value

of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 18, United States Code, Section 982(a)(1), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL:


FOREPERSON




ATTORNEY OF THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA