#### UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| : | |
| v.   : | **Criminal No. 18-cr-293 (RJL)** |
| : | |
| **SEAN T. JOHNSON,** : | |
| : | |
| : | |
| **Defendant.**   : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### EMERGENCY MOTION FOR RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the defendant's Emergency Motion for Release from Custody Due to Immediate Threat Posed by Covid-19 Pandemic (ECF No. 39). For reasons stated below, the government submits that the motion should be denied. In support, the government relies on the following factual and legal authority, as well as any that may be offered at a hearing on these motions.

### PROCEDURAL HISTORY

On September 27, 2018, a federal grand jury sitting in the District of Columbia returned a 16-count indictment charging the defendant with 14 counts of Wire Fraud in violation of 18 U.S.C. § 1343, one count of Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and one count of Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1). The indictment also included a forfeiture allegation. On November 25, 2019, the defendant pled guilty pursuant to a plea agreement to Count Two, Wire Fraud, and Count Sixteen, Aggravated Identity Theft, of the Indictment. For a violation of 18 U.S.C. § 1343, Wire Fraud, the defendant faces a

1

maximum sentence of 20 years of imprisonment and for a violation of 18 U.S.C. § 1028A, Aggravated Identity Theft, the defendant faces a sentence of two years which must be served consecutive to any other sentence. Given the defendant's extensive criminal history, he faces a sentencing guidelines range of is 77-96 months of imprisonment in addition to the two years for Aggravated Identity Theft. A sentencing was scheduled for March 17, 2020; however, that date was vacated due to the circumstances outlined in Chief Judge Howell's standing order.

On March 24, 2020, the defendant filed the instant motion for release. Specifically, the defendant alleged that he suffers from unspecified dental problems that put him at a higher risk. ECF No. 39 at 1. The defendant further alleges that "DDOC is incapable . . . of meaningfully following the CDC's guidance" related to COVID-19. *Id.* at 10. The defendant also cites a declaration by Dr. Marc Stern, a board certified internist specializing in correctional health care. *Id*. With respect to the defendant's Eighth Amendment claim, he suggests that the Department of Corrections acts with "deliberate indifference," "knowingly disregard[ing] a substantial risk of serious harm" to the defendant. ECF No. 28, at 15.

## ARGUMENT

A defendant must be detained pending trial, if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider its decision regarding pretrial detention "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time and that has a material bearing on the issue" of whether there exist conditions for release that would "reasonably assure the appearance of such person as required." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C.

2014) (citing 18 U.S.C. § 3142(f)(2)(B); accord *United States v. Moore*, No. 13–330, 2014 WL 1273439, at *1 (D.D.C. Mar. 31, 2014)).

Once a defendant has been found guilty of a crime – like here – the governing statute shifts to section 3143. According to 18 U.S.C. § 3143(a)(2), for a defendant who is convicted of a crime described in 18 U.S.C. § 3142(f)(1)(A-C) detention is mandatory unless the defendant can both show by clear and convincing evidence that he is neither a flight risk nor danger AND either i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; *or* ii)  attorney for the Government has recommended that no sentence of imprisonment be imposed on the person. Putting aside the issue of dangerousness and flight risk for a moment, the defendant clearly fails to meet either of the remaining requirements.

Because the defendant has pled guilty, there is no substantial likelihood that a motion for acquittal or a new trial would be granted. And, because the offense carries a mandatory minimum term of incarceration and the applicable sentencing guidelines require incarceration and the government has not moved for a downward departure, the government will not and cannot recommend that no sentence of imprisonment be imposed. Therefore, the defendant should be detained under Section 3143(a)(2).

Additionally, 18 U.S.C. § 3145(c) provides that a person may be released, under specific circumstances, if it is "clearly shown that there are exceptional reasons why such's person's detention would not be appropriate." However, courts are divided on whether 18 U.S.C. § 3145(c) also applies as a safety valve in this circumstance or is only applicable to the courts of appeal on appeal, and the D.C. Circuit has not opined on the issue. *See United States v. Briggs*, 577 F. Supp. 2d 435, 436 (D.D.C. 2008) (discussing lack of opinion from the D.C. Circuit);

*United States v. Chen*, 257 F. Supp. 2d 656, 659 (S.D.N.Y. 2003) (compiling and discussing cases from multiple jurisdictions on the issue). The majority of district courts that have addressed the issue appear to have found that 3145(c) does not apply in the present circumstance, and *United States v. Castro*, 2016 WL 3446660 (E.D. Pa. 2016) is particularly instructive. As *Castro* points out, 3145 (a) and 3145(b) are entitled "Review of a Release Order" and "Review of Detention," whereas subsection C is entitled "Appeal from a Release or Detention Order." The title of 3145(c) itself indicates that 3145(c) is intended to apply to and govern appeals from the detention or release order to a court of appeals (as opposed to (a) and (b), which are intended to govern the district court's review of a magistrate judge's release or detention order), because the district court here issued the detention order at the time of the plea and "by definition, a court cannot hear an appeal from its own order." *Id.* Moreover, the text of 3145(c) further clarifies that it intends to apply to the court of appeals, as it states that its procedure is "governed by the provisions of section 1291 of title 28 and section 3731 of this title," two provisions expressly applicable to the courts of appeal and not the district courts.

Assuming *arguendo* that Section 3145(c) does grant district courts authority, it provides that a defendant subject to detention under Section 3142(a)(2) may nonetheless be released if the defendant 1) shows by *clear and convincing* evidence that he is not a flight risk or a danger to any other person or the community *and* 2) "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. Section 3145(c) (emphasis added). If the Court were to find that §3145(c) acts as a possible safety-valve, the reasons proffered by the defendant, at this stage and time, do not warrant "exceptional reasons." Further, the defendant clearly cannot overcome, through clear and convincing evidence, that he is neither a risk of flight nor dangerous, particularly in light of the §3142 factors as detailed above.

Economic danger, which would be a direct consequence of the defendant's release, is a serious danger to the community and is one form of harm the Bail Reform Act is designed to prevent. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence....

*See* S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196. Indeed, Congress stated that many provisions of the Bail Reform Act arose from "the growing problem of crimes committed by persons on release." *Id.*

Case law also supports the conclusion that dangers other than those arising from violent crimes can support detention. "When assessing danger to the community, 'danger may, at least in some cases, encompass pecuniary or economic harm.'" *United States v. Giampa*, 904 F.Supp 235, 358 (D.N.J. 1995) (citation omitted) (listing cases from the 9th Circuit and 3d Circuit denying bail to defendants convicted of fraud offenses). *See also United States v. Harris*, 920 F.Supp. 132 (D.Nev. 1996) (restricting telemarketing employment for defendant charged in telemarketing scam, and stating that "often it is economic or pecuniary interests of a community rather than physical ones which are most susceptible to repeated danger by a released defendant").

Given the danger that the defendant represents – a convicted felon who has spent years lying and stealing from trusting victims their life savings – and his lack of any meaningful connection to the pandemic, the government respectfully requests that this Court deny the defendant's motion.

The defendant argues that the impact of COVID-19 merits release in his case; indeed, his motions contains many of the same general recitations and stock quotations from news articles that form the "cut and paste" core of many such motions filed, some of which have already been rejected by courts. The key question, in fact, is whether there is anything about the defendant *in particular*, rather than the mere existence of COVID-19 as a generality, that uniquely presents this Court with such changed circumstances that would warrant reconsideration of detention.

## I.     The Bail Reform Act factors remain in favor of detention.

### a. *Nature and Circumstances of the Offense*

The defendant has agreed that he operated a serious fraud scheme with numerous victims. The extent and sophistication of the defendant's fraud scheme demonstrates the egregious and severity of his criminal conduct.  First, the defendant used the identity of his previous coworker to create the perception that he was legitimate, even going as far as using text messages and calls to keep up the appearance that he had a real assistant.  Second, the defendant used a complex scheme of promissory notes to make the transactions appear legitimate whereby he would use false home addresses to actual multi-million dollar residences and created "transaction codes" for the promissory notes. Third, the defendant also put false addresses of high-end condominiums in New York on his financial accounts and bills.  Then, he would have his victims search the addresses of these expensive residences to appear credible and legitimate.  Fourth, the defendant concealed his location from his victims through old photos, stock photographs, and videos. The defendant would send his victims photographs and videos of him boarding private jets, showing him in New York or a European country, when he was not actually in those locations.  Fifth, the defendant conned real estate agents into showing him expensive real estate properties, so that he could record the

homes and tell his victims he owned or was purchasing the property. Sixth, the defendant used other people to launder money he acquired from his victims, including his own daughter. Seventh, the defendant's fraud scheme spanned across the United States and other countries over an extended period of time. Lastly, the defendant changed the spelling of his name from "Sean" to "Shawn" in order to avoid internet searches that documented his past fraud schemes. Therefore, the amount of effort and time required to operate this sophisticated fraud scheme demonstrates the egregiousness and severity of the defendant's conduct

The defendant's fraud scheme resulted in a net profit of at least $1,252,576.74, in which a great majority of the money was spent on his luxurious lifestyle. The defendant defrauded multiple individuals of thousands of dollars simply to keep up the appearance of a multi-millionaire and to flaunt his wealth for his next victim. These factors weigh in favor of detention.

    *b. Weight of the Evidence*

This factor also weighs in favor of detention, as the defendant admitted to his conduct and behavior.

    *c. History and Characteristics*

The defendant's criminal history shows someone who has had prior convictions for fraud-related offenses from the age of nineteen through the time he was arrested for this case. The defendant was convicted in 1998 for impersonating an NCO (Non-Commissioned Officer) and an Officer as well as other charges, in 2015 he was convicted of embezzlement, in 2016 reckless conduct and he was on release when he committed the offenses in this case. This factor weighs in favor of detention.

### d. *Danger to the Community*

As set forth above, economic crimes can wreak havoc upon our community. The defendant in particular has caused substantial harm to numerous people, many of whom have yet to recover from his actions. While the government has identified over 20 victims of the defendant's crimes, at least nine of the defendant's victims qualify as having suffered a substantial financial harm and meet the requirements of the of the Sentencing Guidelines §2B1.1(b)(2)(B) enhancement. That means that at least nine victims as a result of the defendant's actions have either (i) became insolvent; (ii) filed for bankruptcy under the Bankruptcy Code (title 11, United States Code); (iii) suffered substantial loss of a retirement, education, or other savings or investment fund; (iv) made substantial changes to his or her employment, such as postponing his or her retirement plans; (v) made substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffered substantial harm to his or her ability to obtain credit. *Id*. The defendant's release will allow him to continue his scheme and increase the number of people who suffer as a result of his lies.

**II.     While the COVID-19 pandemic is dangerous, it is not a changed circumstance that necessitates reconsideration of bond at this time.**

As stated above, the government respectfully submits that the existence of COVID-19 is not a changed circumstance that warrants reconsideration of bond as to the defendant. To start, the defendant has claimed to have a dental problem that puts him at a heightened risk but has not provided any information to support this claim. The defendant has not tied any of his claim of an underlying health condition to risks of severe COVID-19 complications as identified by the CDC. *See* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html. Nor has the government seen any medical documentation establishing a link between COVID-19 and

the defendant. To be clear, the government does not downplay the risks associated with COVID-19, but the existence of the virus in and of itself does not trigger automatic release under these circumstances. Rather, the Court is still required to assess the defendant's particularized factors in determining whether to release him. Moreover, procedurally speaking, the defendant can only be released if the government endorses release (18 U.S.C. § 3143) or if the Court finds an exceptional reason to release (18 U.S.C. § 3145). Here, the government does not endorse release, and, if the Court were to find COVID-19 to be an exceptional reason to release alone, then it only follows that all defendants should also be released. That is neither the law nor practicable under the circumstances.

As this Court is likely aware through prior filings, the government has endeavored – on a case-by-case basis and as a result of the very real public health crisis currently pending – to permit temporary release pursuant to 18 U.S.C. § 3142(i) or 18 U.S.C. § 3145(c) to those who actually *need* release.[1] Here, it is unclear as to how any of the circumstances cited in his motion, in this context, at this time, and with this charge, necessitates release under these circumstances. Furthermore, the defendant has not offered any rationale for why release into a community that is already affected by the virus will protect either individual any more than their current placement at the Department of Corrections.

---

[1] In *United States v. Carl Courtney*, 19-cr-413 (TJK), the government consented to release where the defendant had open wounds and was scheduled for surgery. In *United States v. Larry Key*, 19-cr-292 (JDB), the government consented to release due to the defendant's advanced age, his lung, heart, and kidney disease, and current multiple hospitalizations. The government is sincerely trying to balance the danger of the offender and the pandemic, but cannot ignore a person's record, their conduct, or their alleged or unverified maladies.

9

In preparing to respond to these and other similar motions, the United States Attorney's Office has consulted with the D.C. Department of Corrections (DOC) to obtain relevant information as to its handling of the public health crisis, information that is particularly relevant in this context. Indeed, this office continues consulting with the DOC in light of the rapidly-changing situation. According to DOC, it appears that DOC is handling the situation as well as it can – no different than any organization in the United States that is trying to weather this pandemic. Moreover, DOC is fully committed to protecting its inmates. Unless and until that changes, the government cannot endorse wholesale release of dangerous defendants.

Specifically, as of March 27, 2020, according to DOC, DOC has done the following to ensure the safety of its incarcerated population: (1) banned all non-attorney visits to limit unnecessary exposure; (2) implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.; (3) if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days; (4) DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus; (5) DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.; (6) DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control; (7) DOC has continued

to engage with the USAO and the local Public Defender Service to ensure continuity of operations; (8) DOC checks and rechecks its ventilation system to ensure the air quality in the facilities; (9) DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap), as well as protective gear; (10) DOC would like to limit the number of inmates coming into its facility at any given time; and (11) upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change.

Today, the government learned that DOC reported its first COVID-19 positive test at the Correctional Treatment Facility (CTF) to the courts. The inmate is currently in isolation in the infirmary and being monitored according to the Centers for Disease Control. For the last five days, the inmate was housed in a single-occupancy cell. Moreover, DOC's medical department and Unity Medical Care will continue working with D.C. Health on contact tracing to protect the health and wellbeing of DOC's inmates. DOC has previously handled possible COVID-19 cases with similar case.[2] Sadly, as this Court is likely well aware, the possibility of COVID-19 – a global pandemic – reaching the DOC was always a realistic possibility. It is now incumbent on the government and the Court to balance the security and safety of the community with the safety of the defendant. Here, the defendant claims that an unsupported claim of a dental condition, something not recognized by the CDC as a concern related to COVID-19, and the existence of

---

[2] For example, last week, a Deputy United States Marshal in D.C. Superior Court tested positive for COVID-19. As a result of this positive test, DOC followed its protocols outlined above. Every inmate who might have been exposed to the deputy was placed in quarantine. Of the quarantined inmates, a single inmate became symptomatic, and later tested negative for COVID-19. The remaining inmates nevertheless remained in quarantine to protect the remainder of DOC's population, until the quarantine was safely lifted this weekend. Thus, DOC is continuing to ensure its employees and its inmates' safety.

COVID-19 necessitates wholesale release. That simply cannot be. In this case, there is nothing right now that suggests the defendant has particularized and verified health concerns that necessitates his release. He stands convicted of a serious offense with a mandatory-minimum incarceration term and is a serious danger to the community.

This is not the first time a court has considered bond based on meaningful health emergencies. In *United States v. Johnston*, No. 17-46 (RMM), 2017 WL 4277140 (D.D.C. Sept. 27, 2017), the Court released a defendant for a limited purpose: to obtain surgical treatment. "This is a temporary release to home detention that is narrowly tailored to respond to the exigent and unusual circumstances presented by [the defendant's] cancer diagnosis and the status of his testing and treatment." *Id.* at *9.

When the district court has previously reviewed a motion for release from pretrial detention for health conditions that can be treated at the jail, the court denied the motion, citing that a defendant's "history and characteristics" is only one of four factors that the Court must consider in determining the appropriateness of pretrial detention. *United States v. Parker*, 517 F. Supp. 2d 375, 377 (D.D.C. 2007) (defendant's medical conditions, including diabetes, asthma and hypertension, for which he required ongoing medication and treatment, cannot be dispositive in considering motion for release). First, here, the defendant is no longer held pretrial, but rather has admitted formal guilt. In any event, there is nothing specific in this case that renders the defendant particularly susceptible to health risks related to COVID-19, and nothing, as far as the government is aware of, that suggests DOC is not taking its role seriously during these stressful times.

As defendants continue to ask for release based on COVID-19, courts in this district have begun to assess the validity of these widespread claims.[3] As this Court knows, in *United States v. Hill*, 19-cr-260 (APM) (D.D.C.), the defendant filed a motion for release. The Court denied the defendant's motion for release, without a hearing, noting:

> Defendant's release would present a danger to the community and that there is no condition or combination of conditions that would reasonably assure the community's safety. Although the court recognizes the danger presented by the coronavirus outbreak, and that older populations are more vulnerable, on balance release is not warranted at this time. The Department of Corrections is taking precautions to protect the inmate population, and there is not any reported case within the inmate population (to the court's knowledge). The court is prepared to reconsider this order should conditions change at the jail.

*Id.,* Minute Order, March 19, 2020. In *United States v. Smith*, 19-cr-324 (BAH) (March 23, 2020), the Court – the same Court that issued Standing Order 20-9 that suspended most courthouse operations as a result of the pandemic – remarked that "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained . . . including suspending all in-person visits, programming, and volunteer activities within its facilities, enhanced cleaning efforts, especially within common areas, and vigilant medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14, 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although defendant is in an age group that may be more susceptible to the virus . . . this risk pertains whether the defendant were released or detained, and any heightened risk posed by pretrial detention does not outweigh the presumption in favor of detaining the defendant pretrial, nor does it alter the balance of the statutory factors Congress

---

[3] Yesterday, Judge Amy Berman Jackson released a defendant pursuant to the §3142 factors, but noted that "[i]n light of the Court's decision to grant the motion based on the application of the Bail Reform Act and Circuit precedent, it is not necessary to address whether and how the potential impact of the Coronavirus on the jail population should factor into the analysis." *United States v. Lovelace*, 20-cr-54 (ABJ) (Mar. 25, 2020 D.D.C.) (ECF No. 38, at 12 n.5).

> prescribed for determining the propriety of detention, which all continue to weigh heavily in favor of detention.

*Id.* There is no reason to suggest that in several days, despite the existence of a positive test, that DOC has abandoned its protocol and seeks to endanger its inmates.[4] *See also United States v. Jacob Jordan*, 20-cr-55 (TFH) (March 23, 2020 D.D.C.) (acknowledging the risks associated with COVID but denying release); *United States v. Gonzalez*, 20-cr-40 (BAH) (March 24, 2020 D.D.C.) (denying release, noting the steps taken by DOC); *United States v. Antonio Tabron and Lamont Johnson*, 18-cr-112 (TFH) (denying release after trial); *But see United States v. Harris*, 19-cr-356 (RDM) (March 26, 2020) (releasing defendant in part because of COVID-19 pandemic).

Opinions filed in neighboring districts are in accord.[5] On March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on this very issue. *United States v. Martin*, 2020 WL 1274857, *2 (D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court nevertheless recognized that "resolving . . . an order of detention must in the first instance be an

---

[4] On March 26, 2020, in *United States v. Kofi Appiah and James Hutchings*, 19-cr-361 (BAH), the Court released both defendants, noting that one of the defendants had no criminal history and an underlying medical condition, whereas the other defendant was injured in a jail-related assault that necessitated release. The Court also noted that there was no rebuttable presumption in that case.

[5] *But see United States v. Stephens*, 15-cr-95-AJN (March 19, 2020 S.D.N.Y.) (COVID-19 outbreak and as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.*

Notably, the Court recognized that its decision *cannot* be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i)."

14

individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's proposed use of GPS location monitoring even if the defendant was released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (March 19, 2020 E.D. La.) ("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community").

In fact, the District of Maryland, Greenbelt Division, has almost uniformly denied such petitions on similar, generalized grounds. *See, e.g.*, *United States v. Adams*, 19-cr-257-003, at *3-4 (DKC) (March 25, 2020 D. Md) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Bilbrough, IV*, 20-cr-33, at *4-5, 7 (TDC) (March 20, 2020 D. Md) ("D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities. Although [the defendant] may still be at an increased health risk [from diabetes] . . . this factor alone does not outweigh the other factors."); *United States v. Brown*, 16-cr-553 (RDB) (March 26, 2020 D. Md) (denial of release from BOP custody); *United States v. Jefferson*, 19-cr-

15

487 (CCB) (March 23, 2020 D. Md) ("Precautionary measures have been implemented at CTF in light of the COVID-19 pandemic" denying release to an asthmatic defendant); *United States v. Johnson*, 17-po-9262 (TMD) (March 20, 2020 D. Md) (discussing general risk of exposure to COVID-19, but denial of release on other grounds); *United States v. Jones*, 17-cr-582, at *2 (CCB) (March 20, 2020 D. Md) ("CDF medical personnel are adequately addressing Defendant's medical needs" and the COVID-19 "risks are not the sole determinant of whether detention is appropriate."); *United States v. Legard*, 19-cr-137, at *2-3 (PWG) (March 24, 2020 D. Md) (Asthma was not a basis alone to release a defendant in light of COVID-19 pandemic and that the measures at the D.C. jail are "in compliance with state and federal guidelines regarding protective measures"); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (March 21, 2020 D. Md) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus."); *United States v. Perry*, 14-cr-181, at *1-2 (GLR) (March 26, 2020 D. Md) (denial of release from halfway house due to COVID-19, but on statutory reasons, but also noting that the affidavit of Dr. Marc Stern "lack[ed] the case or institution specificity to determine, with sufficient certainty, the health risks posed at the institution."). In fact, in *United States v. Williams*, 13-cr-544 (PWG) (March 23, 2020 D. Md), the Court even acknowledged that DOC has taken significant measures to stem the tide of the pandemic, but that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly." *Id.* at *5.  Perhaps most explicitly, "[t]he

existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained." *Id.* The Court thus denied a 67-year-old defendant emergency release.

Finally, while the COVID-19 virus is new, arguments based primarily on health concerns are not. Courts have generally recognized that "it is a rare case in which health conditions present an exceptional reason" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (quotations omitted). The U.S. Attorney General's March 26, 2020 memorandum related to the "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic" does not change this calculus. As noted by the memorandum (*see* Exhibit A), "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *Id.* As part of the analysis in assessing whether inmates should be granted home confinement, BOP was encouraged to look at, among other factors, the "age and vulnerability" of the inmate; the inmate's criminal history; whether the inmate has "demonstrated a verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions . . . upon release would present a lower risk of contracting COVID-19 than . . . in his or her BOP facility"; and the assessment of the danger posted by the inmate to the community. *Id.* The government's filing does just that. Notably, the March 26, 2020 memorandum also counsels that "before granting any inmate discretionary release, the BOP *Medical Director* . . . will, based on CDC guidance, make an assessment of the inmate's risk factors for *severe* COVID-19 illness, risks of COVID-19 at the . . . facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement." *Id.* (Emphasis Added). The

17

defendant's request generally summarizes the risk of COVID-19, but in no way establishes the high bar described above, and how his placement in the community would benefit both him *and* the community.[6]

The government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant. But at this stage and at this time, based on the information provided by DOC, DOC appears dedicated and willing to address this public health crisis.[7] Given the plans in place at the DOC and the danger that the defendant represents to the community – the same community also affected by this illness, the government respectfully requests that this Court deny the motion.

### III.    The Defendant's Eighth Amendment rights have not been violated

The defendant finally argues that his continued pretrial detention would subject him to Cruel and Unusual Punishment. This argument is without merit.

Judge Grimm considered this issue, briefly, in *Martin*, before holding that "as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." ___ F.3d at ___, 2020 WL 1274857 at **2-3 (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Loe v. Armistead*, 582 F.2d 1291, 1293–94 (4th Cir. 1978)). As the Supreme

---

[6] *See id.* ("You should grant home confinement only when BOP has determined . . . that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19").

[7] The U.S. Attorney's Office continues consulting with the DOC on a frequent basis in light of the rapidly-changing situation.

Court has long held, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537.

The Courts of Appeal have been even more explicit:

[I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. . . *a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.*

*Shepherd v. Dallas County*, 591 F.3d 445, 454 (5th Cir. 2009) (emphasis added); *see also Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (noting that a pretrial detainee could not make out a Due Process claim without showing that the detention facility demonstrated "deliberate indifference" or "recklessness" with regard to inmate safety) (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)). The defendant cannot satisfy this burden. Far from being deliberately indifferent to the threat of COVID-19, DOC has enacted its own protocol – a protocol that is complaint with CDC and D.C. Department of Health requirements and recommendations. DOC has implemented its

protocol to quarantine inmates who might have been exposed to COVID-19, and also to isolate the only inmate who has tested positive.

Respectfully submitted,
TIMOTHY J. SHEA
United States Attorney
D.C. Bar No. 437437

By: ___/s/_____
Michelle A. Zamarin
DC Bar No.474240
Assistant United States Attorney
Fraud and Public Corruption
555 4th Street, N.W.
Washington, D.C. 20530
202-252-6931
Michelle.zamarin@usdoj.gov

Dated: March 27, 2020